## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL CLARK, Derivatively on Behalf of SAREPTA THERAPEUTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>M. KATHLEEN BEHRENS, RICHARD J. BARRY, KATHRYN BOOR, MICHAEL CHAMBERS, DEIRDRE CONNELLY, DOUGLAS S. INGRAM, STEPHEN MAYO, CLAUDE NICAISE, HANS WIGZELL, DALLAN MURRAY, LOUISE R. RODINO-KLAPAC,<br><br>Defendants,<br><br>-and-<br><br>SAREPTA THERAPEUTICS, INC.,<br><br>Nominal Defendant. | Case No. 1:26-cv-11627<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>__JURY TRIAL DEMANDED__ |

Plaintiff Michael Clark ("**Plaintiff**"), by his undersigned attorneys, brings this Verified Stockholder Derivative Complaint derivatively on behalf of Nominal Defendant Sarepta Therapeutics, Inc. ("**Sarepta**" or the "**Company**") against certain of its current and former officers and directors for, among other things, violations of the Securities Exchange Act of 1934 (the "**Exchange Act**"), breaches of fiduciary duty, and unjust enrichment. Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters, based upon the investigation conducted by and through Plaintiff's attorneys, which included, *inter alia*, a review of the Company's public filings with the United States Securities and Exchange Commission ("**SEC**") and a review of conference call transcripts and announcements made by the Company, wire and press releases published by

and regarding Sarepta, legal filings, news reports, securities analysts' reports and advisories about the Company, information published by the U.S. Food & Drug Administration ("**FDA**") regarding the Company's flagship product, and other information readily obtainable in the public domain. The allegations in this complaint are also based upon a review of books and records produced by the Company in response to Plaintiff's demand made pursuant to 8 *Del. C.* § 220 (the "**Section 220 Production**"), all of which are expressly incorporated by reference into this complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.        This is a derivative action brought to remedy breaches of fiduciary duty by certain directors and senior officers of Sarepta. From at least May 12, 2023 through the present (the "**Relevant Period**"), the Company's fiduciaries touted the safety and commercial potential of their flagship gene therapy, **ELEVIDYS**, while consciously ignoring and concealing critical internal "red flags" regarding its toxicity risks and questionable efficacy. Sarepta's gene therapies, including ELEVIDYS, relied on an adeno-associated virus ("**AAV**") vector known as rh74 to deliver genetic material to treat Duchenne Muscular Dystrophy ("**DMD**") and Limb-Girdle Muscular Dystrophy ("**LGMD**"). This type of gene therapy was positioned as the Company's most important growth driver, with ELEVIDYS alone expected to generate billions in revenue.

2

2.      While Defendants publicly celebrated ELEVIDYS's "consistent" and "laudable" safety profile, ████████████████████████████████████

████████████████████████████████████████████████████

3.      Defendants' statements went beyond mere corporate optimism. Prior to the Relevant Period, Sarepta made a calculated gamble to ████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Moreover, ██████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████ senior management refused to pivot to a more cautious strategy. Instead, they doubled down on their deception, ███████████

█████████████████████████████████████rather than admitting ELEVIDYS's failure, all while aggressively expanding the label to broader, more vulnerable patient populations without disclosing the heightened and deadly risk of acute liver failure.

4.      ██████████████████████████████████████████

████████████████████ On ████████████████████ before the public announcement of topline results from Part 1 of the EMBARK study and in advance of any of the misleading public statements described herein—████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████ ███████████████████████

█████████████████████████████████████████████████████

---

[1] ████████████████████████████████████████████████

██████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████

5.      The truth was revealed through tragedy. In March and June 2025, two patients died of acute liver failure following treatment with ELEVIDYS. Meanwhile, the European Medicines Agency ("**EMA**") froze trials in April 2025 due to rh74 safety concerns and Sarepta slashed earnings guidance in May 2025. A third death was confirmed in July 2025.

6.      Ultimately, the Company's belated disclosures regarding the safety and efficacy of its key product candidates led to an over 80% stock drop.

7.      The FDA subsequently issued a Safety Communication and mandated a "Boxed Warning"—the agency's most prominent safety warning—for acute serious liver injury and acute liver failure, specifically citing fatalities in non-ambulatory patients. Additionally, the FDA required new warnings for Myocarditis and Immune-mediated Myositis—severe immune reactions to the AAV vector that ████████████████████████████████████ ████████████████████████████████ while publicly downplaying safety risks. The updated label further mandated expanded guidance for a modified corticosteroid regimen and enhanced monitoring, directly addressing the very safety concerns the FDA had raised in its ████████ ████████████████████████ As a result of these regulatory interventions, the Company was forced to halt dosing in clinical trials.

4

8.    Defendants also misled the market about its LGMD program, which used rh74 and was plagued by manufacturing and safety issues, stalling development despite claims of progress. With respect to the Company's exon-skipping therapies, Defendants knew the ESSENCE trial lacked sufficient data to show efficacy before the Relevant Period, but repeatedly assured investors that the trial was on track.

9.    While the Company's stock price was artificially inflated by Defendants' pervasive lack of transparency regarding the risks to its flagship product, certain Defendants—including Directors Hans Wigzell ("**Wigzell**"), Stephen L. Mayo ("**Mayo**"), Kathryn Boor ("**Boor**"), and Claude Nicaise ("**Nicaise**")—engaged in suspicious insider trading, collectively selling over $6.2 million in personally held stock while in possession of material non-public information. Most notably, Defendant Wigzell, Chair of the Company's Research and Development Committee ("**R&D Committee**"), sold 15,000 shares of Sarepta stock for proceeds of approximately $1.6 million on August 4, 2023—just two days after the Company publicly claimed a "consistent safety profile," ███████████████████████████████ He continued to sell throughout the Relevant Period, liquidating $4.76 million in total before the truth emerged. Similarly, Defendant Nicaise sold 2,491 shares of Sarepta common stock for proceeds of $248,203 on March 12, 2025—a mere six days before the Company disclosed the first patient death on March 18, 2025, suggesting an urgent effort to exit before the inevitable stock collapse.

10.    As a direct result of this unlawful course of conduct, Sarepta is now the subject of a federal securities class action lawsuit pending in this Court, captioned *In re Sarepta Therapeutics, Inc. Securities Litigation*, Case No. 1:25-cv-13530-BEM (the "**Securities Class**

Action"). Accordingly, the Company's damages continue to grow because of the wrongdoing of the Individual Defendants (defined below).

11.     Plaintiff brings this action to hold these fiduciaries accountable for their bad faith conduct, to recover the illicit proceeds of their insider trading, and to restore value to the Company.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R. 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and the related Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

15.     Plaintiff is, and has been at all relevant times, a shareholder of Sarepta.

6

*Nominal Defendant*

16.    Nominal Defendant Sarepta is a Delaware corporation with its principal executive offices located at 215 First Street, Cambridge, Massachusetts 02142. Sarepta's common stock trades on the NASDAQ under the ticker symbol "SRPT."

*Officer Defendants*

17.    Defendant Douglas S. Ingram ("**Ingram**") has served as President, Chief Executive Officer ("**CEO**"), and a Board member since 2017. Ingram has been named as a defendant in the Securities Class Action.

18.    Defendant Dallan Murray ("**Murray**") joined Sarepta in 2013 as Vice President, Marketing, and serves as Executive Vice President and Chief Customer Officer. Murray has been named as a defendant in the Securities Class Action.

19.    Defendant Louise R. Rodino-Klapac ("**Rodino-Klapac**") joined Sarepta in June 2018 and was appointed Executive Vice President and Chief Scientific Officer in December 2020. Prior to this role, she served as Sarepta's Senior Vice President, Gene Therapy. She became Head of R&D in November 2021. Rodino-Klapac has been named as a defendant in the Securities Class Action.

20.    Defendants Ingram, Murray, and Rodino-Klapac may be collectively referred to herein as the "**Officer Defendants**."

*Director Defendants*

21.    Defendant M. Kathleen Behrens ("**Behrens**") has served as a member of the Board since March 2009 and as Chairwoman of the Board since April 2015. She also serves as a member of the R&D Committee and as Chair of the Audit Committee.

22.     Defendant Richard J. Barry ("**Barry**") has served as a member of the Board since June 2015. He also serves as a member of both the Audit Committee and the Compensation Committee, and as Chair of the Nominating and Corporate Governance Committee.

23.     Defendant Boor has served as a member of the Board since June 2022. She also serves as member of both the Nominating and Corporate Governance Committee and the Compensation Committee.

24.     Defendant Michael Chambers ("**Chambers**") has served as a member of the Board since June 2022. He also serves as a member of the R&D Committee.

25.     Defendant Deirdre Connelly ("**Connelly**") has served as a member of the Board since September 2024. She also serves as a member of both the Nominating and Corporate Governance Committee and the Compensation Committee.

26.     Defendant Mayo has served as a member of the Board since November 2021. He also serves as a member of both the R&D Committee and the Audit Committee.

27.     Defendant Nicaise has served as a member of the Board since June 2015. He also serves as a member of both the Compensation Committee and the R&D Committee.

28.     Defendant Wigzell has served as a member of the Board since June 2010. He also serves as a member of the Nominating and Corporate Governance Committee and as Chair of the R&D Committee.

29.     Defendants Ingram, Behrens, Boor, Chambers, Connelly, Mayo, Nicaise, and Wigzell may be collectively referred to herein as the "**Director Defendants**." The Officer Defendants and the Director Defendants are collectively referred to herein as the "**Individual Defendants**."

8

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

30.     Due to their positions as officers and/or directors of Sarepta, and because of their ability to control the business and corporate affairs of Sarepta, the Individual Defendants owed and continue to owe Sarepta and its shareholders fiduciary obligations of trust, loyalty, good faith, and candor. They were and are required to use their utmost ability to control, manage, and oversee Sarepta in a fair, just, honest, and equitable manner. They were and are obligated to act in the best interests of Sarepta and its shareholders, to treat all shareholders equally, and to refrain from acting in furtherance of their own personal interests.

31.     Because of their positions of control and authority as Sarepta's directors and officers, the Individual Defendants were able to, and in fact did, directly and indirectly exercise control over the wrongful acts described herein. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Sarepta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders.

32.     To discharge their duties, the officers and directors of Sarepta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sarepta were required to, among other things: (i) ensure that the Company was operated in a diligent, honest, and prudent manner; (ii) maintain and implement an adequate and functioning system of internal legal, financial, and management controls; (iii) exercise reasonable control and supervision over the public statements made by the Company's officers and employees; and (iv) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

33.     Moreover, as officers and directors of a publicly traded company whose common stock is registered with the SEC and traded on the NASDAQ, the Individual Defendants owed a duty to cause the Company to report accurate, complete, and truthful information concerning Sarepta's financial condition, operations, products, internal controls, and business prospects. They also had a duty to cause the Company to disclose in its SEC filings all material facts necessary for the market to value the Company's shares based on accurate information. To meet these obligations, the Individual Defendants were required to exercise reasonable oversight and supervision over Sarepta's management, policies, and internal controls.

34.     At all relevant times, the Individual Defendants acted as agents of each other and of Sarepta, and, where applicable, in coordination with one another, and they were acting within the course and scope of such agency.

35.     The Individual Defendants were and are also subject to specific fiduciary obligations imposed by Sarepta's internal policies and corporate governance procedures, and Delaware law.

*Additional Duties Under Sarepta's Code of Business Conduct and Ethics*

36.     Sarepta's Code of Business Conduct and Ethics ("**Code of Conduct**"), which expressly applies to employees, officers, and directors, indicates that the Company "is committed to maintaining the highest standards of business conduct and ethics." While the Code of Conduct reportedly "addresses conduct that is particularly important to proper dealings with the people and entities with whom [Sarepta] as a company interact[s,]" it emphasizes that "it is the responsibility of each employee to apply common sense, together with his or her own personal ethical standards, in making business decisions[.]"

37.     According to the Code of Conduct, an employee who violates the standards set forth therein may be subject to disciplinary action ranging from "a warning or reprimand up to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution."

38.     With regard to insider trading, the Code of Conduct states as follows:

Sarepta requires compliance with all applicable securities laws, including those with respect to insider trading. The Company's Insider Trading Policy provides the Company's guidelines with respect to trading, and causing the trading of, the Company's securities or securities of certain other publicly-traded companies and the handling of confidential information. The Insider Trading Policy applies to all Sarepta directors, officers and employees.

39.     The Code of Conduct also includes a lengthy section entitled "Conflicts of Interest," which states, in relevant part, the following:

We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided.

* * *

Supervisors may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists… Officers and directors may seek authorizations and determinations from the Audit Committee of the Board of Directors.

40.     With regard to "Corporate Opportunities," the Code of Conduct states as follows:

You may not take personal advantage of opportunities for the Company that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information, unless authorized by the Chief Compliance Officer or the Audit Committee of the Board of Directors. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. Participation in an investment or outside business opportunity that is directly related to our lines of business must be pre-approved. You may not use your position with us or corporate property or

11

information for improper personal gain, nor should you compete with us in any way.

41. In discussing the "integrity of [Sarepta's] records and public disclosure[,]" the Code of Conduct states, in relevant part, the following:

Intentionally making false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees, stockholders and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

* * *

[W]e rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

* * *

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to the Chief Compliance Officer, or one of the other compliance resources described in Section 16.

12

42.    The Code of Conduct also provides procedures and resources for reporting suspected or actual violations, as "even the appearance of impropriety can be very damaging and should be avoided."

***Additional Duties of Audit Committee Members***

43.    The Audit Committee Charter indicates that the Audit Committee will be responsible for assisting the Board in exercising "its fiduciary responsibility of providing oversight of (a) the integrity of the Company's financial statements and the financial reporting processes, internal accounting and financial controls, [and] (b) the Company's compliance with legal and regulatory requirements..."

44.    Pursuant to the Audit Committee Charter, the Audit Committee's duties include:

*Internal Controls*

* * *

11.  Prior to the filing of any Annual Report on Form 10-K, review and discuss with management, internal audit staff and the independent auditor (a) reports as to the state of the Company's financial reporting systems and procedures, the adequacy of and testing results of internal accounting and financial controls, the integrity and competency of the financial and accounting staff, disclosure controls and procedures, other aspects of the financial management of the Company, (b) recommendations for both the improvement of existing controls and adoption of new controls, including any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies, if any, (c) current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate;

* * *

13.    Review and discuss with management and the independent auditors the financial statements to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K), including the judgment of the independent auditors about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements;

* * *

13

16.  Review press releases, as well as Company policies with respect to earnings press releases, and financial information provided to analysts and review such releases, and information and oversee the use of non-Generally Accepted Accounting Principles (non-GAAP) financial measures and related disclosures, including compliance with the Company's Non-GAAP Financial Measures Accounting Policy;

*Risk Assessment and Risk Management*

17.  Periodically, but no less than annually, discuss Company policies with respect to risk assessment and risk management, and review risks that may be material to the Company's financial operations and major legislative and regulatory developments that could materially impact the Company's financial operations and risks;

*Compliance Oversight and Reporting*

18.  Review (a) the status of compliance with laws, regulations, and internal procedures, including, without limitation, the Company's policies on ethical business practices; and (b) the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through receiving reports from management, legal counsel and third parties as determined by the Committee and report on the same to the Board;

19.  Establish procedures for the confidential and anonymous receipt, retention and treatment of complaints regarding the Company's accounting, internal controls, auditing matters and compliance with the Company's ethical business policies;

20.  Ensure that the Company maintains a written Code of Business Conduct and Ethics and other policies and procedures that effectively address the Company's compliance obligations, avoidance of conflicts of interest, and other related matters.

45.     Moreover, the Audit Committee has "full authority" to "institute investigations of matters brought to its attention" and "to review all aspects of the Company's financial operations on a planned basis."

## SUBSTANTIVE ALLEGATIONS

## I.    ELEVIDYS AND DUCHENNE MUSCULAR DYSTROPHY

46.     Sarepta has long positioned its gene therapy ELEVIDYS (delandistrogene moxeparvovec, formerly SRP-9001) as a groundbreaking treatment for DMD, a rare genetic

14

disorder caused by a specific genetic mutation in the gene that codes for dystrophin.[2] Primarily affecting males, DMD causes progressive muscle degeneration. While there is currently no cure for DMD, researchers are investigating ways to modify progression of the disease. Sarepta's gene therapies, including ELEVIDYS and those for LGMD, were the "twin pillars" of its business alongside exon-skipping therapies. Gene therapies were hailed as the Company's single most important growth driver, critical to revenue and stock price, with market focus on their safety due to AAV vector risks.

47.    From its early development stages, the Company characterized ELEVIDYS as a potential game-changer, emphasizing its innovative micro-dystrophin delivery via an AAV vector to address the root cause of DMD. The AAV vector used was rh74, which Defendants touted as safe, ███████████████████████████████████████████████

███████████████████████████████████

48.    Critics, however, say this enthusiasm often outpaced the evidence, with Sarepta facing accusations of aggressive marketing and regulatory maneuvering that amplified expectations beyond what clinical data supported. Even as the drug received "Fast Track" designation from the FDA in 2020, early trials showed only modest functional improvements.

49.    In 2023, the FDA granted initial accelerated approval for ELEVIDYS in a limited population of ambulatory boys aged 4-5, but this decision was controversial because it overrode internal FDA reviewers' recommendations amid debates over the surrogate endpoint of dystrophin production not clearly correlating with clinical benefits.

---

[2] Dystrophin is a protein that plays a key role in the function of muscle cells and protects them from damage as muscles contract and relax. Mutations in the dystrophin gene lead to a lack of dystrophin protein in the muscles, causing muscles to grow weaker over time. *See* Envision, Sarepta Therapeutics, Inc., https://clinicaltrials.sarepta.com/ENVISION (last visited Jan. 22, 2026).

50.     By 2025, revelations of serious adverse events, including patient deaths from acute liver failure, underscored accusations that Sarepta had overpromised while underdelivering. A MIT Technology Review article described the situation as a "deadly saga," arguing that ELEVIDYS exemplified how hype in gene therapy can lead to tragic outcomes when benefits remain "not so firm."[3]

## II.    FOUNDATIONAL STUDIES AND AUTHORIZATION PROCESS

51.     ELEVIDYS's clinical development program included a series of sequential studies designed to evaluate safety, micro-dystrophin[4] expression, and functional efficacy across varying patient populations. These studies progressed chronologically from early-phase investigations focused on proof-of-concept to later-phase confirmatory trials supporting regulatory approval. The sequence reflects standard drug development progression, proceeding in phases that began with small-scale safety assessments and advancing to larger efficacy evaluations: Phase 1/1b for initial safety and biological activity; Phase 2 for dose confirmation and preliminary efficacy; and Phase 3 for confirmatory evidence. ███████████████████████ ██████████████████████████████████████████ ██████████████████

---

[3] Hamzelou, Jessica. 2025. "The Deadly Saga of the Controversial Gene Therapy Elevidys." MIT Technology Review, July 25, 2025. https://www.technologyreview.com/2025/07/25/1120621/deadly-saga-controversial-gene-therapy-elevidys/, last visited 8 Jan. 2026.

[4] Micro-dystrophins are shortened but functional versions of dystrophin, which are designed to be small enough to fit into an AAV vector while retaining the primarily functionality of the full-length dystrophin protein. https://pmc.ncbi.nlm.nih.gov/articles/PMC10210223/#:~:text=Microdystrophin%20is%20designed%20to%20produce%20controlled%20and,*%20Microdystrophin%20demonstrates%20durable%20and%20widespread%20expression.

*December 2017: Study SRP-9001-101*

52.    Study SRP-9001-101 (NCT03375164) was initiated in December 2017. It was a Phase 1,[5] open-label,[6] single-dose study in four ambulatory boys aged 4-17 years with DMD. Participants received a single intravenous infusion of ELEVIDYS. According to the Company, the study demonstrated initial safety with no serious adverse events directly attributed to the therapy beyond transient liver enzyme elevations manageable with corticosteroids. Robust micro-dystrophin expression was observed (mean levels around 28.1% by Western blot at Week 12), along with preliminary functional improvements in North Star Ambulatory Assessment scores.[7]

*March 2019: Study SRP-9001-102*

53.    Study SRP-9001-102 (NCT03769116) was initiated in March 2019. It was a Phase 2,[8] randomized, double-blind, placebo-controlled study in 41 ambulatory boys aged 4-7 years with

---

[5] Phase 1 studies gather information about how a new drug interacts with the human body. As a Phase 1 trial continues, researchers study side effects associated with increased dosage and begin to develop information about efficacy in order to determine how best to administer the drug to limit risks and maximize benefits. *See* Step 3: Clinical Research, FDA, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies (last visited Jan. 22, 2026).

[6] An open-label study (also called nonblinded) is a study in which both the health care providers and the patients are aware of the drug or treatment being administered. *See* NCI Dictionary of Cancer Terms, National Cancer Institute, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/open-label-study (last visited Jan. 22, 2026).

[7] The North Star Ambulatory Assessment ("**NSAA**") is a 17-item rating scale used to measure functional motor abilities in ambulant children with DMD. It evaluates various activities, such as standing, walking, running, and climbing, with scores ranging from 0 to 34, where higher scores indicate better ambulatory function. NSAA, POD-NMD, https://www.pod-nmd.org/assessment/nsaa/ (last visited Jan. 11, 2026).

[8] While Phase 2 studies are not large enough to show whether a drug will ultimately be beneficial, they provide some information as to efficacy and safety and assist with the development of Phase 3 research protocols. *See* Step 3: Clinical Research, FDA, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies (last visited Jan. 22, 2026).

DMD. Participants were randomized to ELEVIDYS or placebo, with crossover after 48 weeks. According to the Company, the study confirmed micro-dystrophin expression (mean 28.1% by Western blot at Week 12) and functional benefits, including a 1.7-point improvement in NSAA scores versus placebo at Week 48.

*November 2020: Study SRP-9001-103 – The "ENDEAVOR" Study*

54.    Study SRP-9001-103 (ENDEAVOR; NCT04626674) ("**ENDEAVOR**") was initiated in November 2020. It was a Phase 1b, open-label, multicenter study with over 50 participants across 8 cohorts, including ambulatory (aged 2-17 years) and non-ambulatory (no age limit) patients. It reportedly demonstrated high micro-dystrophin expression (mean 54-94% across cohorts by Western blot at Week 12) and functional stabilization (e.g., NSAA improvements or maintenance up to 3 years).

*October 2021: Study SRP-9001-301 – The "EMBARK" Study*

55.    Study SRP-9001-301 (EMBARK; NCT05096221) ("**EMBARK**") was initiated in October 2021. It was a Phase 3,[9] randomized, double-blind, placebo-controlled, two-part crossover study in 125 ambulatory boys aged 4-7 years. Notably, it missed its primary endpoint (NSAA change from baseline to Week 52; difference 0.65 points, p=0.2441), but achieved secondary endpoints, including micro-dystrophin expression (mean ~34% at Week 12, p<0.0001) and timed function tests (e.g., time to rise improvement of -0.64 seconds, p=0.0025).

---

[9] Phase 3 studies are designed to demonstrate whether a drug offers a treatment benefit to a specific population. While less common side effects may go undetected in previous studies, Phase 3 studies provide most of the safety data regarding a drug because they are larger and last longer. Step 3: Clinical Research, FDA, https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#Clinical_Research_Phase_Studies (last visited Jan. 22, 2026).

*Pre-Clinical Development Failures and Suppressed Safety Warnings*

56.     As alleged in the Consolidated Class Action Complaint recently filed in the Securities Class Action,[10] Sarepta internally dubbed its gene therapy program "Project Moonshot" because, as Defendant Ingram later acknowledged, the strategic plan's mandate to develop a blockbuster gene therapy in just a few short years was "so ambitious," particularly for a company that had no experience with complex gene therapies and, as Ingram further acknowledged, "knew next to nothing about" developing them. Nevertheless, Ingram admitted that Sarepta's internal plan "said we were going to develop that therapy as fast as possible." Securities Complaint at ¶78. This pressure to rush development pervaded the Company's preclinical safety program for the rh74 viral vector at the heart of all of Sarepta's gene therapies, including ELEVIDYS.

57.     According to an independent expert consultant who oversaw Sarepta's rh74 preclinical testing program until 2023 ("**FE 1**"),[11] Sarepta committed foundational violations of FDA Good Laboratory Practice ("**GLP**") regulations (21 C.F.R. §58) throughout the rh74 preclinical safety program. Specifically, FE 1 reported that Sarepta failed to establish and maintain an Independent Quality Assurance Unit or to install an independent study director for its rh74 preclinical safety program, in direct contravention of 21 C.F.R. §§58.33 and 58.35. FE 1, along with Sarepta's Director of Quality Assurance and its Director of GLP, repeatedly raised these issues with senior management—warnings that were delivered to Defendants Ingram and Rodino-Klapac—but were told to push ahead regardless. Securities Complaint at ¶¶70-71.

58.     FE 1 further reported that Sarepta personnel engaged in "testing into compliance"— a practice specifically proscribed by FDA guidance—in which samples that failed to satisfy

---

[10] *See* Securities Class Action, ECF No. 133 (the "**Securities Complaint**").

[11] Each "FE" referred to herein represents a former employee or consultant of Sarepta who was interviewed in connection with the Securities Complaint.

prespecified safety parameters were successively re-tested until a passing result was achieved. FE 1 characterized the resulting data as "voodoo data" generated "to get the result you want." Additionally, Sarepta instructed personnel to finalize testing protocols before the Company had even acquired the laboratory systems on which the tests were to be run and, in some cases, before the laboratory facilities were even constructed. FE 1 reported that he raised these issues repeatedly with executive management, including Defendants Ingram and Rodino-Klapac, telling them "[t]his is illegal[,]" while they responded, in substance: "We don't care, we have to go quicker … We're going to assume the risk, to push this." Securities Complaint at ¶¶72-74. Significantly, FDA toxicologists later noted that at least some of the preclinical animal toxicology data reported in Sarepta's BLA for Elevidys was "not consistent" with the actual data recorded by computerized lab equipment. Securities Complaint ¶75.

59.      As further alleged in the Securities Complaint, Sarepta's commercial formulation of ELEVIDYS contained an extraordinary level of impurity: approximately 50% of the viral capsids in the infusion were "empty"—meaning they did not contain the therapeutic gene cassette. Gene therapy manufacturers target a 100% full capsid rate, with optimized large-scale manufacturing processes in use at the start of the relevant period achieving ratios in excess of 80% and often exceeding 90%. The FDA considers empty capsids to be an "impurity" and admonishes manufacturers to "use purification methods that reduce empty capsids." The enormous viral load required by rh74 ($1.33 \times 10^{14}$ vector genomes per kilogram of body weight), combined with this 50% impurity rate, meant that a typical non-ambulatory teenager weighing approximately 70 kg would receive approximately 9.31 quadrillion vector genomes—more than 1,000 times the number of cells in the patient's body—not counting the additional astronomical number of empty capsids. Senior Sarepta scientists repeatedly raised concerns about the safety risks of this viral load and

impurity rate in meetings attended by Defendants Ingram and Rodino-Klapac. Securities Complaint at ¶¶80-83.

*2021 Expert Panel Warnings and Hy's Law Suppression*

60.      As further alleged in the Securities Complaint, in the fall of 2021, amid widespread internal concerns about rh74's liver toxicity, Sarepta convened a panel of outside experts—characterized by a former Director of Clinical Development (FE 3) as "real big hitters" in hepatology and gene therapy—to review rh74's safety. Multiple former Sarepta employees (FEs 2, 3, and 4) independently confirmed that these experts expressed significant concerns about rh74's potential hepatotoxicity in light of its enormous viral load, particularly in the heavier non-ambulatory patients who would need to receive a maximal dose but would also have significant comorbidities that would exacerbate the seriousness of, and complicate recovery from, liver injury. As FE 3 explained, these experts "100%" told Sarepta that "because of [rh74's] particularly high viral load there was a real risk in the non-ambulatory population." Securities Complaint at ¶¶84-85. Notably, Dr. Sidney Barritt, a prominent hepatologist recruited to the panel, warned that standard steroid prophylaxis would be inadequate to manage rh74's hepatotoxicity and that highly aggressive immunosuppression therapy (e.g., sirolimus or rituximab), coupled with prolonged rigorous physician monitoring, would be required. Securities Complaint at ¶85. Defendant Rodino-Klapac attended several of these panel meetings personally. Securities Complaint at ¶86.

61.      Around the same time, as the Securities Complaint further alleges, Sarepta's Pharmacovigilance unit made a deeply alarming discovery. A former Executive Medical Director in Sarepta's Pharmacovigilance unit (FE 5) reported that his team observed that an Elevidys patient had experienced a Hy's Law event—a case of severe drug-induced hepatocellular injury that the FDA characterizes as "an ominous indicator" of the potential for a drug to cause serious liver

21

injury, including death or the need for transplant. FDA guidance explains that even one such event in a typical clinical trial database of 1,000 to 3,000 subjects is "worrisome," and finding two is "highly predictive" of fatal liver injury at scale. Sarepta observed this signal after fewer than 40 patients had been treated. Both Sarepta's internal Pharmacovigilance team and an eminent independent outside hepatologist confirmed the Hy's Law finding. FE 5 and the Company's Gene Therapy Safety Lead, Dr. Mark Vivien, reported the finding to Sam Yonren, VP of Global Pharmacovigilance, who initially accepted the assessment and directed it be reported to the FDA. Securities Complaint at ¶¶88-91.

62.     However, as FE 5 reported in the Securities Complaint, Sarepta management then intervened. Under pressure from regulatory leadership, Yonren reversed course, stating the Hy's Law event "had been assessed incorrectly, and we needed to reassess it." FE 5 reported that Yonren "did not show any interest in what the actual safety profile was. His interest was in managing our deliverables, so that management was happy." FE 5 believed the assessment was ultimately changed under management pressure to avoid characterizing the event as Hy's Law. Securities Complaint at ¶92. The suppression of this critical safety signal—years before the patient deaths that are at the heart of this action—demonstrates that Sarepta's pattern of prioritizing commercial objectives over patient safety was not a recent development, but a deeply embedded corporate practice that the Board knew or should have known about and failed to prevent.

*May 2023: Cellular, Tissue, and Gene Therapies Advisory Committee Action*

63.     On May 12, 2023, the FDA's Cellular, Tissue, and Gene Therapies Advisory Committee ("**CTGTAC**") convened to discuss Sarepta's Biologics License Application

("**BLA**")[12] for SRP-9001. The committee voted narrowly (8-6) in favor of accelerated approval for ELEVIDYS.

64.    Following the split vote, the Company issued a press release on May 12, 2023, calling it a "positive vote" based on the "totality of evidence including the SRP-9001 product design as well as biological and empirical data." The press release recognized that "CTGTAC's vote, while not binding, will be considered by the FDA when making its decision regarding the potential accelerated approval of SRP-9001. The Biologics License Application (BLA) for SRP-9001 is currently under priority review by the FDA with a regulatory action date of May 29, 2023."

*May 2023: Study SRP-9001-303 – The "ENVISION" Study*

65.    Study SRP-9001-303 (ENVISION; NCT05881408) ("**ENVISION**") was initiated in May 2023. It was designed as a Phase 3, randomized, double-blind, placebo-controlled study targeting ambulatory (aged 8-17 years) and non-ambulatory (no age limit) patients.

66.    On June 8, 2023, Sarepta released an update on ENVISION, indicating that the study was a "key component" in the Company's "global regulatory strategy to reach the broadest patient population possible, as quickly as possible."[13] As part of this strategy, the ENVISION study was "proposed to serve as the required post-marketing confirmatory trial to verify and describe clinical benefit in the non-ambulatory population." The Company's ability to bring the ENVISION study to conclusion would be considered by the FDA at the time of the EMBARK study readout.

*June 2023: Accelerated "Approval"*

67.    On June 21, 2023, the FDA released the Summary Basis for Regulatory Action ("**SBRA**") for ELEVIDYS, disclosing a significant internal disagreement regarding Sarepta's

---

[12] A Biologics License Application is a request to introduce, or deliver for introduction, a biologic product into interstate commerce. *See* 21 CFR 601.2.

[13] https://www.sarepta.com/srp-9001-303-envision-study-enrollment-us.

BLA for accelerated approval. The SBRA stated that the Clinical, Clinical Pharmacology, and Statistics review teams did not recommend approval, concluding that there was insufficient evidence to support ELEVIDYS micro-dystrophin expression as a surrogate endpoint reasonably likely to predict clinical benefit. The review committee formally recommended against approval, as summarized in the SBRA:

> Certain members of the Review Committee recommend approval of this Biologics License Application (BLA) via the Accelerated Approval pathway... However, the Clinical, Clinical Pharmacology, and Statistics review teams and supervisors conclude that the data submitted in the BLA in support of Accelerated Approval of ELEVIDYS is not adequate to meet the threshold for approval. Therefore, the Review Committee does not recommend approval of the BLA.

68. The SBRA detailed the review teams' specific concerns, including the failure of the primary efficacy endpoint, noting that "[t]he difference between the overall ELEVIDYS group and the placebo group was not statistically significant ($p = 0.37$)... The difference between the ELEVIDYS and placebo groups at all time points is well within the uncertainty bounds, also demonstrated by the absence of even a trend toward statistical significance."

69. It further noted the lack of validation for the surrogate endpoint, stating that:

> Members of the Review Committee do not consider the available data satisfactory to support use of expression of ELEVIDYS microdystrophin as a surrogate endpoint 'reasonably likely to predict clinical benefit'... Results of partial Spearman analysis... suggested ELEVIDYS micro-dystrophin accounts for 11% of the variation in NSAA Total Score change. This result is not sufficiently persuasive.

70. It also identified serious safety risks, including "[t]wo cases of immune-mediated myositis, including one life-threatening case... [and] acute serious myocarditis" observed following ELEVIDYS infusion.

***The Director of the Center for Biologics Evaluation and Research Grants Accelerated Approval***

71. Notwithstanding these objections, on June 22, 2023, Peter Marks, M.D., Ph.D. ("**Dr. Marks**"), Director of the Center for Biologics Evaluation and Research, exercised his

24

authority to override the review committee's recommendation and granted accelerated approval for ELEVIDYS, limited to ambulatory pediatric patients *aged 4 to 5 years* with confirmed mutations in the DMD gene.

72.     Dr. Marks restricted the approval to this narrow age group due to weaker data in older children and, as a condition of the approval, required the ongoing confirmatory randomized EMBARK clinical trial. This override permitted ELEVIDYS to reach the market via the accelerated approval pathway despite the review teams' findings of inadequate evidence of clinical benefit, an unvalidated surrogate endpoint, and unresolved serious safety signals.

### October 2023 – EMBARK Part 1 Results

73.     On October 30, 2023, Sarepta announced topline results from Part 1 of the EMBARK study consisting of the primary 52-week data from this global, Phase 3, randomized, double-blind, placebo-controlled trial evaluating ELEVIDYS (delandistrogene moxeparvovec-rokl) in 125 ambulatory boys aged 4 to 7 years with DMD.

74.     The primary endpoint was the change in NSAA total score from baseline to Week 52. ELEVIDYS treated patients (n=63) showed least squares mean improvement of approximately 2.6 points, compared to 1.9 points in the placebo group (n=61), yielding a treatment difference of 0.65 points (95% CI: -0.45 to 1.74).

75.     In short, this difference did not achieve statistical significance (p=0.2441). Sarepta attributed this outcome to unexpectedly minimal functional decline in the placebo arm over the 52-week period, suggesting that the NSAA may lack sensitivity (though the Company repeatedly had touted NSAA as the appropriate litmus test to detect meaningful short-term changes in this younger ambulatory population, where disease progression is typically slower than in older patients).

25

76.    Despite the primary endpoint miss, the Company asserted that prespecified key secondary endpoints demonstrated statistically significant benefits favoring ELEVIDYS.

77.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

78.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████

79.    ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

███████

80. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ ███ ████ █ █ █ █ ████ █ ███████ ███ █

████████████

81. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████

82. ████████████████████████████████████

(A) ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



*Label Expansion and Dr. Marks' Second Intervention*

84.      Prior to June 21, 2024, three FDA review teams—the clinical, clinical pharmacology, and statistical teams—along with two senior officials, recommended rejecting Sarepta's application to broaden ELEVIDYS's approval. These teams cited insufficient and conflicting clinical data, unreliable exploratory analyses of secondary measures (such as standing speed), and the absence of any demonstrated correlation between micro-dystrophin protein expression and improvements in physical function. Notably, Lola Fashoyin-Aje, a senior FDA

official, characterized the supportive findings as merely hypothesis-generating and insufficient to support regulatory action.

85.    Notwithstanding these recommendations, on June 21, 2024, Dr. Marks again overruled the review teams' objections. As a result, the FDA expanded ELEVIDYS's approval to include approximately 80% of U.S. Duchenne patients over age 4 with confirmed mutations in the DMD gene (excluding certain deletions), regardless of ambulatory status, while simultaneously converting the prior accelerated approval to traditional (full) approval for ambulatory patients.

## III.    SERIOUS ISSUES SURFACE

86.    ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████—significant safety concerns with ELEVIDYS surfaced in post-marketing experience during 2025. These issues, primarily acute serious liver injury culminating in fatal acute liver failure, manifested predominantly in non-ambulatory patients, a population with limited pre-approval exposure in clinical trials.

87.    The problems first surfaced publicly in March 2025, when Sarepta disclosed the death of a non-ambulatory teenage boy from acute liver failure following ELEVIDYS treatment.

88.    A second similar fatality in a non-ambulatory teenage patient was reported in June 2025, prompting Sarepta to voluntarily suspend U.S. distribution of ELEVIDYS for non-ambulatory individuals and the FDA to issue a safety communication initiating an investigation. These events highlighted a differentiated risk profile, as Sarepta later noted an absence of such fatalities among over 1,000 treated ambulatory patients.

89. Escalation continued in July 2025 with a third patient death attributed to liver failure—this time in a separate Sarepta gene therapy trial for LGMD—further intensifying regulatory scrutiny and safety concerns across the company's AAV-based platform.

90. On July 25, 2025—the same date as the MIT Technology Review article discussed below—██████████████████████████████████████████████████

████████████████████████████████████████████████

████ ████ ████ █████ █████ █████ ██ ██████████████ █████

████████████████████████████████████████████████

██████████████

91. First, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

92. Second, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

93.    Third, ███████████████████████████████████████

████████ ██ ██ █████ █████ ████████ █████ █████ ███ █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

94.    Fourth, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

95.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

96.     ████████████████████, on July 25, 2025, MIT Technology Review published the article titled "The Deadly Saga of the Controversial Gene Therapy Elevidys," which critiqued the therapy's approval amid uncertain benefits and linked the deaths to broader issues of hype in gene therapy development.

97.     Concurrently, in July 2025, the EMA issued a negative opinion on ELEVIDYS marketing authorization, citing failure to meet primary endpoints in the EMBARK trial and insufficient evidence of clinical benefit. This decision was based on safety concerns and clinical data reviews. As a result, ELEVIDYS is not available in the EU.[14]

98.     In the UK, regulatory approval for ELEVIDYS is on hold, influenced by the EMA's negative opinion, which blocks pathways for approval. It is not authorized for use.[15]

99.     These accumulating safety signals and regulatory setbacks culminated on November 14, 2025, when the FDA approved revisions to the ELEVIDYS prescribing information, adding a boxed warning for the risk of acute serious liver injury and acute liver failure (including fatal outcomes) and removing the indication for non-ambulatory patients entirely, restricting use to ambulatory individuals aged 4 years and older. [16]

---

[14] Roche Provides Regulatory Update on Elevidys™ Gene Therapy for Duchenne Muscular Dystrophy in the EU, Roche (July 25, 2025), https://www.roche.com/media/releases/med-cor-2025-07-25 (last visited Jan. 12, 2026).

[15] Elevidys, Muscular Dystrophy UK (last updated Aug. 5, 2025), https://www.musculardystrophyuk.org/get-involved/campaign/current-campaigns/access-to-treatments/delandistrogene-moxeparvovec/ (last visited Jan. 12, 2026).

[16] FDA Approves New Safety Warning and Revised Indication that Limits Use for Elevidys Following Reports of Fatal Liver Injury, U.S. Food & Drug Admin. (Nov. 14, 2025), https://www.fda.gov/news-events/press-announcements/fda-approves-new-safety-warning-and-revised-indication-limits-use-elevidys-following-reports-fatal (last visited Jan. 12, 2026).

100.    This reversal underscored that the severe hepatotoxicity risks, particularly in advanced-stage or non-ambulatory DMD patients, had not been adequately characterized or mitigated prior to the 2024 broad approval, despite limited supporting data from small cohorts in trials like ENDEAVOR.

101.    The post-marketing revelations directly contradicted earlier assurances of a manageable safety profile and exposed patients to unforeseen lethal risks, ultimately necessitating the FDA's strongest warning and a significant contraction of the approved population.

## IV.    ACTUAL KNOWLEDGE OF MATERIAL RED FLAGS

102.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

*Comparative Safety Data: rh74 Far More Hepatotoxic Than Competing Treatments*

103.    As alleged in the Securities Complaint, by no later than October 2023, Sarepta's accumulating patient data showed that rh74 was associated with an unusually profound risk of clinically significant liver injury, totally contrary to Defendants' public statements touting rh74's "particularly laudable safety profile." Using Proportional Reporting Ratios ("**PRR**")—a foundational pharmacovigilance tool relied upon by the FDA, which considers a PRR of 2 to represent a safety signal—Sarepta's data showed that Elevidys had a PRR of 10 for hepatobiliary adverse events just weeks after commercial dosing began. In other words, the ratio of reported liver injury on Elevidys was 10 times higher than would be expected in the absence of a signal.

104.    Throughout the remainder of the Relevant Period, Elevidys' PRR for hepatobiliary adverse events remained between 5 and 6, far higher than any competing vector. Elevidys' PRR was 2 to 5 times higher than Zolgensma's—the only other gene therapy evincing an appreciable signal—and 5 to 10 times greater than competing DMD treatments. Securities Complaint at ¶¶97-101, Figures 3-4.

105.    This data was readily accessible to the Board and senior management. As former Sarepta employees reported in the Securities Complaint, Sarepta's Pharmacovigilance department generated routine adverse event reports (at least monthly) and maintained a live adverse event "dashboard" that was "openly available" across senior management. Adverse event data was also compiled and reported to management in quarterly reports. Securities Complaint at ¶95. Both Defendants Ingram and Rodino-Klapac assured investors they were closely monitoring rh74's liver safety and repeatedly made detailed, data-laden statements on the subject. Securities Complaint at ¶96.

████████████████████████████████████████████████

106.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

107.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



108. ███████████████████████████████████████████

109. ███████████████████████████████████████████

110. ███████████████████████████████████████████

███████████████████████████████████████████████ Study SRP-9001-104 was reportedly terminated due to "business decision."[17]

_____

[17] A Gene Transfer Therapy Study to Evaluate the Safety and Efficacy of Delandistrogene Moxeparvovec (SRP-9001) Following Imlifidase Infusion in Participants With Duchenne Muscular Dystrophy (DMD) Determined to Have Pre-existing Antibodies to Recombinant

35

███████████████████████████████████████

111.   ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

112.   ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████

█████████████████████████████████████████████

113.   ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

114.   ████████████████████████████████████████

███████████████████████████████████████████████

Adeno-Associated Virus Serotype (rAAVrh74), ClinicalTrials.gov (last updated Nov. 20, 2025), https://clinicaltrials.gov/study/NCT06241950 (last visited Jan. 12, 2026).

115. █████████████████████████████████

████████████████████████████████████

███████████████

116. █████████████████████████████████

████████████████████████████████

117. █████████████████████████████████

████████████████████████████████████

████

██████████████████████████████

118. █████████████████████████████████

██ ████ █ ███ ███ ███ ███ ██ ██████ ██

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████████████

119.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████

120.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

121.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

***Deliberate Obfuscation of Safety Data Using Non-Standard Terminology***

122. In addition to omitting material safety information from its public statements, as the Securities Complaint alleges, Sarepta deliberately obscured the severity of rh74's hepatotoxicity in the limited data it did present to the public. A former Medical Director at Sarepta (FE 2) reported that, in order to obscure safety signals, Sarepta avoided standardized medical terms (specifically the MedDRA "hepatobiliary disorders" adverse event class, which captures actual liver injury) and instead used "Sarepta-specific terms" and bespoke endpoints. These bespoke endpoints combined reports of actual liver injury with common, benign surveillance findings such as transient liver enzyme elevations that reflect laboratory measurements rather than disease states. The effect was to "wash out" signals of actual liver injury in public reporting. Securities Complaint at ¶99. In June 2025, a leading hepatologist told Cowen analysts that "multiple Elevidys pts have presented with the necessary serum biomarkers for ALF" as defined by regulators and clinicians, but Sarepta never reported those events as acute liver failure because they did not meet "Sarepta's non-standard criteria for the term." Securities Complaint at ¶99 n.30. The Board knew or should have known of this systematic obfuscation, which prevented investors and physicians from accurately assessing the true risk profile of ELEVIDYS.

## V.    THE COMPANY'S SCHEME OF CONCEALMENT

123.    Despite actual knowledge of the red flags detailed above, the Individual Defendants engaged in a scheme to mislead shareholders, patients, and their families.

*Phase I: Misrepresentation of Regulatory Strength (May 2023 – August 2023)*

124.    Despite knowing of the ██████████████████████████████████████████, Defendant Ingram publicly stated on June 22, 2023: "As we prepare to launch ELEVIDYS... Sarepta will move rapidly to submit a BLA supplement... as broadly as good science permits." This statement was materially misleading as it failed to disclose the specific regulatory findings that the "risk-benefit assessment... is negative."

125.    On August 2, 2023, Defendant Ingram stated: "The launch of ELEVIDYS is off to a great start... consistent with our track record, the ELEVIDYS launch is going well." Defendant Rodino-Klapac added that the drug demonstrated a "consistent safety profile." These statements were false. At the time, ████████████████████████████████████████████████ ████████████████████████████████████.

*Phase II: Concealment of EMBARK Trial Failure (November 2023)*

126.    On November 1, 2023, Sarepta announced topline results for the confirmatory EMBARK trial. Defendant Ingram claimed: "The third quarter was a defining moment for Sarepta... the results of EMBARK confirm that ELEVIDYS stabilizes muscles... and does so with a laudable safety profile."

127.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



128.

129.

***Phase III: The Illusion of Safety Amidst Crisis (2024 – 2025)***

130.    Throughout 2024 and early 2025—despite the mounting red flags discussed in Section IV, *supra*—Defendants continued to hype the drug's commercial success and safety.

131.    For example, in February 28, 2024, Defendant Ingram stated that "ELEVIDYS' performance was particularly impressive... notwithstanding, a label limited to four and five-year-olds." Defendant Rodino-Klapac stated the Company would "evaluate broadening the approved indication... By removing age and emulation restrictions and converting the ELEVIDYS accelerated approval to a traditional approval." ██████████████████████████████

████████████████████████████████████████████████████

132.    On May 1, 2024, during the Company's Q1 2024 earnings call, Defendant Ingram stated that the Company is "[w]orking with the FDA, we continue to productively prosecute our BLA supplement to expand the ELEVIDYS addressable population... If successful, 2024 could be the most profound year yet." Defendant Rodino-Klapac added that "the totality of data generated for ELEVIDYS supports that it is a disease-modifying therapy... demonstrating a treatment benefit that is clinically meaningful and similar regardless of age."

133.    On June 20, 2024, upon FDA approval for patients ages four and above, the Company issued a press release quoting Defendant Ingram calling the event "a watershed occasion for the promise of gene therapy and a win for science." ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

134.    On August 7, 2024, during the Company's Q2 2024 earnings call, Defendant Ingram claimed: "Everything is going very, very well…" and "[w]e're doing brilliantly." Defendant Murray stated: "We're confident in [sites'] ability to manage this," regarding patient demand. These statements were misleading given the growing ████████████████████ ██████████████ .

135. On November 6, 2024, Defendant Ingram stated: "Reflecting our detailed preparation and track record of commercial execution, the launch of ELEVIDYS is proceeding to plan." Defendant Rodino-Klapac explicitly stated: "As of the end of October 2024... we have dosed over 80 late ambulatory and non-ambulatory patients within our clinical program and continue to see a consistent safety profile." These statements were materially false. By this time, the Board knew ███████████████████████████████████████████████ ██████████████ directly contradicting the claim of a "consistent safety profile."

136. On January 27, 2025, Defendant Rodino-Klapac stated: "The consistency and totality of evidence supporting a long-term and clinically meaningful treatment benefit with ELEVIDYS continues to grow." This statement omitted the ████████████████████████ ████████████████████████████████████████.

137. Critically, as the Securities Complaint alleges, the first patient who would die from acute liver failure was hospitalized on February 7, 2025, with life-threatening liver injury, including bilirubin levels exceeding 10 times the upper limit of normal and liver enzyme values meeting Hy's Law criteria. Sarepta did not disclose this hospitalization until March 18, 2025—more than a month later—when the patient's death triggered FDA-imposed disclosure obligations. In the interim, the Individual Defendants continued to issue false and misleading statements touting the therapy's safety, including the statements that immediately follow. Securities Complaint at ¶135, n.44.

138. On February 26, 2025, Defendant Ingram stated: "In 2025... net product revenue guidance of $2.9 billion to $3.1 billion... We have passed 600 patients now on therapy... These data are further proof of the transformative potential of ELEVIDYS." Defendant Rodino-Klapac added: "ELEVIDYS demonstrated a clinically meaningful response across all of Sarepta studies...

that supports the durability of the therapy." These statements maintained the illusion of a flawless

product just weeks before the first patient death was disclosed.

139. ███████████████████████████████████

140. ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

*Concealment of Other Failures Within Sarepta's Gene Therapy Franchise*

141.    As alleged in the Securities Complaint, the Board's oversight failures extended beyond ELEVIDYS safety to encompass Sarepta's entire gene therapy franchise. Multiple former Sarepta employees (FEs 2, 3, 6, and 7) independently confirmed that the Company's LGMD gene therapy program—which Defendants told investors represented in excess of 70% of Elevidys' blockbuster potential—had effectively stalled by the start of the Relevant Period. The LGMD 2A and 2B programs, accounting for approximately 65% of all LGMD patients, were beset by severe manufacturing difficulties, and the Company's "dual vector" technology required for the 2B program was never successfully manufactured. By 2023, Sarepta management had privately instructed personnel to suspend patient outreach for the LGMD 2A and 2B programs. Securities Complaint at ¶¶110-14.

142.    Throughout the Relevant Period, clinical trial designs were kept in what FE 2 described as "a loop of study design"—protocols would be "approved, cancelled, approved, cancelled" for years—keeping the LGMD program from making any real clinical progress. By the beginning of 2024, patient outreach across almost the entire LGMD portfolio had ground to a halt. On October 1, 2024, Sarepta terminated the LGMD program's head of patient recruitment without replacement. One month later, Sarepta announced the acquisition of siRNA therapies from Arrowhead Pharmaceuticals for $825 million upfront plus $550 million in milestone payments. Despite investor questions about whether this signaled a loss of confidence in gene therapy, Defendants denied any deprioritization. Former employees characterized Defendants' public

45

statements about the LGMD program as "deceitful" and "the biggest myth." Securities Complaint at ¶¶115-19; 131-32.

143.    The Securities Complaint also alleges that Defendants failed to prevent the concealment of the doomed status of the ESSENCE study—the confirmatory trial on which the FDA had conditioned Sarepta's continued approval to market its exon-skipping therapies, which generated approximately half of the Company's product revenue during the Relevant Period. As Defendants ultimately admitted in November 2025, they knew before the Relevant Period began that COVID-19 had prevented the collection of adequate patient data, rendering the study unable to detect the hypothesized improvement with statistical significance. Despite this, Defendants repeatedly assured investors that ESSENCE was "fully enrolled" and "on track." Securities Complaint at ¶¶121-25.

144.    FE 2, a former Medical Director at the Company, confirmed in the Securities Complaint that even before the Relevant Period began, the pandemic and the Russia-Ukraine conflict prevented Sarepta from collecting enough patient data to power the study. Sarepta's response included: (a) costly but largely unsuccessful efforts to recruit additional international clinical sites; (b) three successive delays of the ESSENCE readout, each strategically timed to avoid coinciding with Elevidys regulatory submissions; and (c) a sudden change of the primary endpoint in October 2024, eight years into the study, to a measure described as more "sensitive." When ESSENCE finally reported in November 2025, it failed by a wide margin (p=0.23). The Board's failure to ensure truthful disclosure about the trial's viability exposed the Company to the potential loss of marketing authorization for products generating over $1 billion in annual revenue. Securities Complaint at ¶¶126-29.

**THE MATERIALLY FALSE AND MISLEADING 2025 PROXY STATEMENT**

145.    On April 24, 2025, the Individual Defendants caused the Company to file a definitive proxy statement on Schedule 14A (the "**2025 Proxy**") soliciting votes at the 2025 Annual Meeting.[18] The 2025 Proxy sought re-election of Class II directors (Defendants Richard J. Barry, M. Kathleen Behrens, Stephen L. Mayo, and Claude Nicaise), approval of Say-on-Pay, auditor selection, and amendments to increase authorized shares under the 2018 Equity Incentive Plan by 4,300,000 and the Employee Stock Purchase Plan by 300,000.

146.    The 2025 Proxy was materially false and misleading. First, it falsely portrayed ELEVIDYS optimistically as a key driver of 2024 performance, revenue, and compensation, without any mention of safety risks, adverse events, or the March 2025 patient death disclosure. This omission is material because the 2025 Proxy was filed after the first death was made public (*see* ¶87, *supra*), ███████████████████████████████████████ ████████████████████████████████ No balanced discussion of risks appears in the 2025 Proxy, misleading shareholders into approving compensation and equity plans tied to ELEVIDYS's "success." (*See* Executive Compensation section, Grants of Plan Awards table, and CD&A discussion; Proxy at 24-25, 37, and related Summary Compensation Table. *Id*. at 50-60).

147.    Second, the 2025 Proxy misleadingly portrayed ELEVIDYS as an unqualified success driving compensation, stating: "Elevidys Label Expansion: Achieved non-ambulatory (50% earned); metrics: Ages 4-7 (30%), Ambulatory (40%), Non-Ambulatory (50%)." This is part of the PSU (Performance Stock Units) milestones, where ELEVIDYS's 2024 label expansion (including non-ambulatory patients) directly contributed to executive compensation vesting and bonuses. The 2025 Proxy ties this to overall 2024 achievements: "Key to 2024 success: Label

---

[18] Sarepta Therapeutics, Inc., Proxy Statement (Form DEF 14A) (Apr. 24, 2025).

expansion (ages 4+, non-ambulatory via accelerated/traditional approval); $821M revenue (part of $1.79B total); drove bonuses, PSUs (Milestone 1 achieved 50%), salary increases." (*See* Executive Compensation section, Grants of Plan Awards table, and CD&A discussion; *Id*. 24-25, 37, and related Summary Compensation Table. *Id*. at 50-60).

148.    This portrayal is false and misleading because it conceals known safety risks in non-ambulatory patients, including acute liver failure leading to the March 2025 death (¶87, *supra*) and eventual FDA removal of the non-ambulatory indication in November 2025 (¶99, *supra*). By celebrating the non-ambulatory expansion as a "success" metric for PSUs (50% earned) without disclosing the emerging hepatotoxicity crisis ███████████████████████████ ██████, the Proxy misleads shareholders into approving say-on-pay (Proposal 2) and equity increases (Proposals 3-4) under the false premise of sustained commercial viability. This omits that adverse events could (and did) lead to pauses in dosing and regulatory restrictions, rendering the "achievement" illusory and self-interested.

149.    Third, the 2025 Proxy omitted safety risks and adverse events in product discussions, referencing ELEVIDYS positively without any risk disclosure. No mentions of safety profiles, adverse events, efficacy data, risks, or regulatory hurdles (e.g., discontinuation of programs) appear. Instead, the 2025 Proxy indicates that the consistency and totality of evidence supporting a long-term and clinically meaningful treatment benefit with ELEVIDYS continues to grow, tying ELEVIDYS to revenue and milestones in the Compensation Discussion & Analysis section of the proxy. This omission is false and misleading because, ███████████████████ ████████████████████████████████████████████████████████ and the March 2025 patient death from acute liver failure in a non-ambulatory patient (¶87, *supra*). The 2025 Proxy's omission of these (while hyping ELEVIDYS's "transformative potential" and

revenue) is materially misleading regaridng the therapy's safety. This concealment induces approval of compensation tied to ELEVIDYS (e.g., bonuses at 135% achievement, page ~50), violating fiduciary duties and risk oversight. No discussion of trial pauses or scrutiny balances the positive narrative.

150. Fourth, the 2025 Proxy also made misleading claims on risk oversight and corporate governance, stating: "Risk Oversight: Board/Committees handle risks (e.g., audit: liquidity/regulatory; compensation: incentives; nominating: succession)... annual risk assessment (no material adverse effect)." The R&D Committee (overseeing R&D strategy) is mentioned but provides no detailed report on ELEVIDYS risks. These claims are false and misleading and omissive because the Board failed in risk oversight by ignoring red flags like ████████████ ████████████████████████████████████████████████ ████████████ The 2025 Proxy's assurance of effective oversight ("no material adverse effect") is misleading, as it omits the Board's knowledge of these issues (e.g., ████████████████████████). This induced votes for director re-elections (Proposal 1) and compensation (Proposal 2) under a false sense of diligence. The Code of Conduct reference is undermined by allegations of violations through concealment.

151. Fifth, the 2025 Proxy promoted self-interested equity plan amendments tied to performance, stating in Proposal 3: "Amend 2018 Equity Incentive Plan: Increase shares by 4,300,000 to 17,487,596 for talent retention; 2024 grants: 60,200 options, 84,100 awards to executives." Proposal 4: "Amend 2016 ESPP: Increase shares by 300,000 to 1,700,000." These are justified by 2024 performance, including ELEVIDYS revenue and label expansion. "Philosophy: Competitive, performance-aligned (pay-for-performance); at-risk incentives (50% LTI)" (Proposals section and Equity Plans' *id*. 24-30), with details in Executive Compensation on

pages 37-78, including Pay vs. Performance. This promotion is false and misleading because it dilutes shares under false pretenses of ELEVIDYS's success, while concealing risks that could erode value. By tying increases to 2024 metrics (e.g., $821M ELEVIDYS revenue, without risk disclosure), the 2025 Proxy misleads on sustainability, especially post-March 2025 death. This enables "excessive compensation" for defendants allegedly interested in self-enrichment (e.g., insider sales), violating loyalty duties.

152.     In general, the 2025 Proxy lacks any discussion of ELEVIDYS's safety risks, adverse events, or the March 2025 patient death, despite its filing date (after the disclosure). It omits clinical trial details (e.g., EMBARK failure) and focuses solely on positive revenue/milestones (e.g., in CD&A and PSU sections). This aligns with the allegations of an illusion of safety, potentially misleading shareholders on Proposals 1-4.

## INSIDER SALES

153.     During the Relevant Period, while the Company's stock price was artificially inflated, Individual Defendants engaged in improper insider sales, netting total proceeds of over $6.2 million. The timing of these sales demonstrates that Defendants capitalized on material, non-public adverse information regarding ELEVIDYS's safety and efficacy before it was revealed to the market. These sales align with scienter indicators, including core operations involvement and compensation motives.

154.     Defendant Wigzell engaged in multiple suspicious transactions. On August 4, 2023, just two days after the Company publicly claimed a "consistent safety profile," Wigzell sold 15,000 shares for proceeds of $1,600,000. ███████████████████████████

████████████████████████████████████████████████████

███████ Later, on December 15, 2023, Wigzell sold another 25,500 shares for $3,160,370. ███

155. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

156. Similarly, Defendant Mayo, a member of the R&D Committee, sold 3,135 shares for proceeds of $385,478 on December 15, 2023. █████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

157. Defendant Boor sold 2,397 shares for proceeds of $298,949 on June 10, 2024. ███

██████████████████████████████████████████████████████

████████████████████████████████████████████████

158.    Finally, Defendant Nicaise sold 2,491 shares for proceeds of $248,203 on March 12, 2025. This transaction was executed a mere six days before the Company disclosed the first patient death. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

159.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the wrongdoing alleged herein. Sarepta is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.    Plaintiff will adequately and fairly represent the interests of Sarepta in enforcing and prosecuting its rights.

161.    Plaintiff has continuously been a shareholder of Sarepta at all times relevant to the wrongdoing complained of and is a current Sarepta shareholder.

162.    When this action was filed, Sarepta's Board consisted of the following nine Director Defendants: (i) Barry; (ii) Behrens; (iii) Boor; (iv) Chambers; (v) Connelly; (vi) Ingram; (vii) Mayo; (viii) Nicaise; and (ix) Wigzell (collectively, the "**Demand Board**"). Plaintiff did not make any demand on the Demand Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

163.    A pre-suit demand on the Demand Board is futile because the Director Defendants face a substantial likelihood of liability for their bad faith conduct and are not independent.

164.    **The Board's Knowledge and Bad Faith:** Demand is futile because a majority of the Board faces a substantial likelihood of liability for breaching their fiduciary duty of loyalty by acting in bad faith. Specifically, Directors Behrens, Wigzell, Mayo, Nicaise, and Chambers—who comprised the R&D Committee tasked with direct oversight of ELEVIDYS—possessed actual knowledge of critical safety and efficacy failures that were actively concealed from shareholders.

165.    █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

166.    █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

167. ████████████████████████████

168. ████████████████████████████

169. ████████████████████████████

███████████████████████████████████████████████

██████████████████████

170.     The disconnect between what the Board knew—████████████████████

████████████████████████████████████████████████████—and what they

permitted the Company to tell the public is undeniable proof of scienter. The Board did not merely

miss these issues; they actively managed them as public relations crises rather than the patient

safety emergencies they were. This pattern of bad faith conduct excuses the requirement for a pre-

suit demand.

## CLAIMS FOR RELIEF

## COUNT I

**Against the Individual Defendants**
*for Breach of Fiduciary Duty*

171.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

172.     The Individual Defendants violated and breached their fiduciary duties of loyalty,

reasonable inquiry, and good faith. They engaged in a sustained and systematic failure to properly

exercise their fiduciary duties by permitting the use of inadequate practices to guide the truthful

dissemination of Company news, allowing false and misleading statements to be disseminated,

and concealing the serious safety risks associated with ELEVIDYS.

173.     Each of the Individual Defendants violated and breached their fiduciary duties of

candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the

misconduct described herein.

174.     The Individual Defendants had actual or constructive knowledge that the Company

issued materially false and misleading statements, and they failed to correct the Company's public

55

statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

175.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

176.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

178. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sarepta has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180. Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants
*for Aiding and Abetting Breach of Fiduciary Duty*

181. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

183. Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
*for Unjust Enrichment*

184. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sarepta.

186. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sarepta that was tied to the performance or artificially inflated valuation of Sarepta, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

187. Moreover, as alleged herein, Individual Defendants Wigzell, Mayo, Boor, Murray, and Nicaise engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $6.2 million.

188. Plaintiff, as a shareholder and a representative of Sarepta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

189. Plaintiff on behalf of Sarepta has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants**
*for Waste of Corporate Assets*

190. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

192. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

193. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

194. Plaintiff, on behalf of Sarepta, has no adequate remedy at law.

## COUNT V

**Against Individual Defendants Ingram, Murray, and Rodino-Klapac**
*for Contribution Under Sections 10(b) and 21D of the Exchange Act*

195. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196. Sarepta and Individual Defendants Ingram, Murray, and Rodino-Klapac are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Ingram's, Murray's, and Rodino-Klapac's willful and/or reckless violations of their obligations as officers and/or directors of Sarepta.

197. Defendants Ingram, Murray, and Rodino-Klapac, because of their positions of control and authority as officers and/or directors of Sarepta, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sarepta, including the wrongful acts complained of herein and in the Securities Class Action.

198.    Accordingly, Ingram, Murray, and Rodino-Klapac are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

199.    As such, Sarepta is entitled to receive all appropriate contribution or indemnification from Ingram, Murray, and Rodino-Klapac.

200.    Plaintiff, on behalf Sarepta, has no adequate remedy at law.

## COUNT VI

**Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a))*
*and Rule 14a-9 (17 C.F.R.§240.14a-9)*

201.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

203.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

204.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

60

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

205. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement and the 2025 Proxy Statement, which were filed with the SEC.

206. As alleged above, the 2025 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi) the Individual Defendants failed to fulfill their risk oversight responsibilities.

207. Moreover, the 2025 Proxy Statement was materially false and misleading because it omitted, among other things, that: (i) ELEVIDYS posed substantial safety risks to patients; (ii) ELEVIDYS trials and protocols failed to detect severe side effects; (iii) the extent of the adverse events from ELEVIDYS treatment would cause Sarepta to pause recruitment and dosing in ELEVIDYS trials, attract scrutiny from regulators, and result in larger risk surrounding the therapy's present and expanded approvals; (iv) by recommending that the Company's stockholders approve the named executive officer compensation, the amendment to the 2018 Plan, and

Amendment No. 3 to the 2016 ESPP, the Individual Defendants were wrongfully interested in increasing their compensation; (v) the Individual Defendants violated the Company's Code of Conduct; and (vi) the Individual Defendants failed to fulfill their risk oversight responsibilities.

169. The misrepresentations and omissions in the 2024 Proxy Statement and the 2025 Proxy Statement were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy Statement and 2025 Proxy Statement, including, but not limited to, the reelection of certain Individual Defendants and the approval of the named executive officer compensation, the amendment to the 2018 Plan, and Amendment No. 3 to the 2016 ESPP.

208. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2024 Proxy Statement and the 2025 Proxy Statement.

209. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

210. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT VII

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

211. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue the materially false and misleading statements alleged herein.

213. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 7, 2026                    Respectfully submitted,

                                        **LEVI & KORSINSKY, LLP**

                                        /s/ *Shannon L. Hopkins*
                                        Shannon L. Hopkins
                                        1111 Summer Street, Suite 403
                                        Stamford, CT 06905
                                        Tel.: (203) 992-4523
                                        Fax: (212) 363-7171
                                        shopkins@zlk.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
gnespole@zlk.com
csuk@zlk.com

**HACH ROSE SCHIRRIPA & REHNS LLP**
Scott R. Jacobsen (*pro hac vice* forthcoming)
John W. Baylet (*pro hac vice* forthcoming)
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel.: (212) 213-8311
sjacobsen@hrsrlaw.com
jbaylet@hrsrlaw.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Michael Clark, do hereby verify that I am a holder of common stock of Sarepta Therapeutics, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   March  30 , 2026

*Michael Clark*
Michael Clark (Mar 30, 2026 13:50:19 EDT)
Michael Clark